**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SUNDRAM FASTENERS LIMITED,

      Plaintiff,

v.                                                    Case Number: 08-CV-13103

FLEXITECH, INC.,

      Defendant.

_____/

**FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND APPLICATION OF FACTS TO THE LAW**

The matter is before the court for a determination pursuant to Federal Rule of Civil Procedure 52(a)[1] on Plaintiff Sundram Fasteners Limited ("Sundram's") breach of contract claims against Defendant Flexitech, Inc. ("Flexitech").

## I. INTRODUCTION

On March 8, 2006, Flexitech issued Blanket Purchase Order No. P3612327 (the "Blanket Purchase Order") to Sundram regarding the purchase of two types of banjo bolts. Throughout 2006, Flexitech sent releases and forecasts to Sundram, and Sundram shipped the banjo bolts to a warehouse in Michigan, where they were picked up by Flexitech. In January of 2007, Flexitech ceased issuing releases for bolt shipment. Sundram sent Flexitech numerous emails over the next couple of months seeking to confirm the upcoming shipment schedule. Flexitech did not respond.

---

[1] Rule 52(a) provides: "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).

Finally, at the end of March of 2007, there were no outstanding releases, and Flexitech terminated the relationship.

On July 18, 2008, Sundram filed the current lawsuit, alleging that Flexitech breached its contractual duty by (1) refusing to compensate Sundram for 2.2 million bolts left in the supply chain upon contract termination, and (2) not providing releases for the total number of bolts negotiated before the Blanket Purchase Order.  On June 15, 2009, Flexitech filed a motion for summary judgment, which the court denied on July 23, 2009.  A bench trial was held September 29, 2009 to October 1, 2009.  In addition to the trial testimony, the parties designated and submitted portions of deposition transcripts that were reviewed by the court and are a part of the trial record.  (*See* 10/16/09 Stipulation.)

For the reasons discussed in detail below, after considering the testimony and receiving the exhibits, the court will hold that Flexitech performed all of its obligations under the Blanket Purchase Order and that advanced notice was not required in order to terminate it.  The contract dispensed with notice.  Moreover, even if notification was required, the notice given contemporaneous to termination was reasonable under the circumstances based on (1) the industry standard regarding blanket purchase orders, (2) the fact that Sundram received three months of zero quantity releases, and (3) the language of the contract.

The parties entered into a contractual relationship as set forth in the Blanket Purchase Order and subsequent releases pertaining to that order.  Flexitech was bound to purchase only those quantities for which it issued firm releases.  The contract had an express termination provision which stated:  "FNGP/Flexitech may terminate the Blanket

2

Purchase Order in whole or in part at any time, for any reason, without penalty." (Trial Ex. 325, 326.) Flexitech performed its obligation under the Blanket Purchase Order by paying for all of the bolts for which it issued firm releases. It then terminated the Blanket Purchase Order pursuant to the termination clause that allowed it to terminate it "at any time, for any reason, without penalty." Flexitech did not breach the contract, and it is not liable for the bolts that Sundram claims remained in the supply chain. Any other decision would be altering the bargain to which the parties agreed when they entered into the Blanket Purchase Order. *See Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 258 (7th Cir. 1998) ("Contracts allocate risks, and judicial decisions changing those allocations after the fact not only lead to expensive litigation (as each inside invests in the pursuit of advantage) but also make the institution of contract less useful *ex ante*.").

## II. FINDINGS OF FACT

The parties have jointly submitted proposed findings of fact. The court has adopted many of the facts in which the parties are in agreement and finds that these facts are supported by the evidence presented at trial.[2] Where there were factual disputes, the court has weighed the evidence and made a determination. As stated by Plaintiff in its closing argument, the parties are substantially in agreement as to the facts of the case. It is the legal consequences of those facts that are truly in dispute. That said, the court finds as follows:

### A. The Parties

---

[2]For convenience, the court has cited to the fact number designated by the parties where the parties are in agreement. Where the parties are not in agreement, the court has cited to the record.

3

1.      Sundram is located in Chennai, India.  Its Fasteners Division fabricates

        fasteners, bolts, and other basic items for export to many countries, including the

        United States.  Most of Sundram's customer base in the United States is in the

        automotive and vehicle manufacturing industries.  (Joint Fact #1.)

2.      Flexitech is a manufacturer of brake hose assemblies and oil coolers.  Flexitech's

        corporate headquarters is located in Plymouth, Michigan, and its primary

        manufacturing facility is located in Bloomington, Illinois.  (Joint Fact #3.)

3.      At the time the claim in this matter arose, Flexitech was owned by Freudenberg

        and Co. Kommanditgesellschaft ("Freudenberg").  The current owners of

        Flexitech are Mitsubishi Corporation and Meiji Flow Systems Co. Ltd.  (Joint Fact

        #4.)

4.      At the time of the events pertinent to this litigation, certain of the purchasing

        functions of Flexitech were being performed on Flexitech's behalf by employees

        of Freudenberg, including Francesca DeMars.  DeMars was authorized to

        perform such functions on behalf of Flexitech.  (Joint Fact #5.)

### B. Contract Negotiations

5.      In November 2005, DeMars initiated discussions with Sundram for the potential

        supply of two parts referred to as "banjo bolts" to Flexitech.  The banjo bolts were

        used in the manufacture of brake assemblies supplied to General Motors

        Corporation.  (Joint Fact #6,7.)

6.      Between November 17, 2005 and December 3, 2005, DeMars sent four email

        requests to Sundram for price quotes on the two banjo bolts.  DeMars included a

        Request for Quote with these emails, RFQ #11569590-001, where she requested

4

quotes for "price breaks at 1 million, 3 million, and 5 million (pieces)."  (Joint Fact #10(a).)  On December 5, 2005, P. Sathya Vageeswaran, Manager in Exports at Sundram, responded to DeMars via email and stated that Sundram's price is US $0.40 per part.  (Joint Fact #10(b).)  Vageeswaran's email further stated that Sundram's price remains the same for all three projected volumes—one million, three million, or five million—because there is no change in Sundram's manufacturing process.  (Joint Fact #10(b); Vageeswaran Dep. Test. at 8.)

7.   On December 29, 2005, DeMars responded that Flexitech wanted to obtain a price of US $0.18 per part.  On January 5, 2006, Vageeswaran responded with a quote of US $0.36 per part "for all three projected volume" because "our price is the same since there is no change in our manufacturing process."  (Joint Fact #10(c).)

8.   In response to a January 24, 2006 email from DeMars, Subramanian Abirama Sekaran, Senior General Manager at Sundram, sent an email stating that Sundram would offer a price of 27.5 cents per bolt for Part No. 36-75003 ("Part 03") and 30 cents per bolt for Part No. 36-75004 ("Part 04").  (Trial Ex. 322; Sekaran Dep. Test. at 10.)  The email stated that these prices were based on annual purchase volumes of 4.5 million bolts for Part 04 and 1.6 million bolts for Part 03.  (Trial Ex. 322.)  It further stated, "The prices quoted are not applicable if the volume is reduced as our costing is based on the revenue generated."  (*Id.*)

9.   DeMars responded to Sekaran's email of January 24, 2006 by requesting that Sundram complete a Request for Quote form.  Sundram sent DeMars the filled out form for the two bolts on January 27, 2006.  The filled out form contained the

prices and volumes set forth in the Sekaran email of January 24, 2006.  (Trial Exs. 322, 324.)

10.  Following the receipt of the filled out Request for Quotation Form, Flexitech advised that it wished to have Sundram's facilities in India inspected by representatives of Flexitech or an affiliate.  This inspection occurred on February 24, 2006.  On February 28, 2006, DeMars advised Sundram that she had received the results of this inspection and would input Sundram into Flexitech's approved supplier listing and financial system.  (Joint Fact #14.)

### C. The Blanket Purchase Order

11.  On or about March 8, 2006, Flexitech issued Purchase Order number P3612327 (the "Blanket Purchase Order") to Sundram pertaining to the two banjo bolts. The Blanket Purchase Order is the governing contractual document between the parties.  At the time the Blanket Purchase Order was issued, Sundram understood what a blanket purchase order was and that it was the controlling document for the purchase and supply of the banjo bolts.  The Blanket Purchase Order states that it is governed by Michigan law.  (Joint Fact #15.)

12.  The Blanket Purchase Order indicated a unit price of US $0.275 for Part 03, and a unit price of US $0.300 for Part 04.  (Joint Fact #16.)  The Blanket Purchase Order did not contain any annual volume requirements, was not exclusive, and was not a requirements contract.  It did not require Flexitech to purchase any minimum quantities nor did it require that Flexitech pay or reimburse Sundram for any existing inventory or raw materials at the time the Blanket Purchase Order was terminated.  (Joint Fact #16(a),(b),(c),(e),(f).)

6

13.     Because it was not a requirements contract, the Blanket Purchase Order did not

        contain quantities of banjo bolts to be ordered, on an annual basis or otherwise,

        or any delivery dates.  (Joint Fact #17(a).)  Sundram never indicated to Flexitech

        that the Blanket Purchase Order must contain minimum volume requirements.

        (Joint Fact #17(b).)  The only quantities of product indicated on the document

        were 300 parts which were to be submitted to Flexitech for "PPAP" approval.

        (Joint Fact #17.)

14.     DeMars' testimony is based upon eleven years of experience in the automotive

        supply industry and is credible and authoritative.

15.     Quantity terms or volume requirements are never contained in a blanket

        purchase order.  As a standard practice, Flexitech did not and does not

        guarantee volumes.  Flexitech's own customers, such as General Motors, do not

        guarantee volumes.  (DeMars Dep. Test. at 69, 78.)

16.     The first page of the Blanket Purchase Order stated: "ALL CHANGES TO THIS

        ORDER AND REFERENCED PART(S) INCLUDING DIMENSIONS,

        SPECIFICATIONS, AND/OR ASSOCIATED COSTS MUST BE AUTHORIZED

        BY MEANS OF A PURCHASE ORDER CHANGE."  (Joint Fact #17(c).)

17.     The reverse side of the Blanket Purchase Order was headed "TERMS AND

        CONDITIONS."  (Joint Fact #17.)  The terms and conditions were expressly

        incorporated into the Blanket Purchase Order: "IMPORTANT: ON REVERSE

        SIDE HEREOF ARE THE TERMS AND CONDITIONS TO WHICH SELLER

        AGREES BY ACCEPTANCE OF THIS ORDER."  (Joint Fact #17(e).)

7

18.     The terms and conditions stated that Sundram, as the seller of the banjo bolts, "shall be bound by the provisions, including those appearing on the face hereof, of this order."  (Joint Fact #17(d).)

19.     The terms and conditions further stated: "Conditions, terms of instructions (including among others, those relating to delivery schedule, price, quantity and specifications) stated by Seller in acknowledging this order in any form of acceptance or otherwise which in any way differ from, conflict with or are in addition to those of this order are hereby objected to by Purchaser and they shall be null and void and shall not affect Purchaser's offer as represented hereby, and shall not be binding on Purchaser, unless expressly agreed to in writing by Purchaser."  (Joint Fact #17(f).)

20.     The second page of the Blanket Purchase Order stated that "terms and conditions will be discussed and agreed upon by both parties."  (Joint Fact #17.)

21.     The Blanket Purchase Order contained a termination clause which provided: "FNGP/Flexitech may terminate the Blanket Purchase Order in whole or in part at any time, for any reason, without penalty."  (Joint Fact #16(l).)  The terms of the Blanket Purchase Order did not require Flexitech to provide any advanced notice of, or reason for, termination.  (Trial Exs. 325, 326.)

22.     Sundram was aware of the termination clause in the Blanket Purchase Order. (Joint Fact #16(k).)  Sundram did not seek to amend the termination provision in any way, nor did it propose any modifications to any terms of the Blanket Purchase Order with respect to the termination clause or otherwise (Joint Fact #16(k),(l)).

8

23.    When asked about the termination provision by defense counsel, Vageeswaran

        stated, "In fact, we have not given anything related to this termination and we

        have not had any discussion with this because when we received the order and

        we started our business relationship, the first thing we don't want to go and tell

        [sic] about the termination of the business."  (Vageeswaran Dep. Test. at 48.)

### D. Releases and Forecasts

24.    The Blanket Purchase Order was not a requirements contract, and both Flexitech

        and Sundram understood and agreed that releases would be issued against the

        Blanket Purchase Order, which would indicate when and what quantities would

        be shipped.  (Joint Fact #26.)

25.    In the automotive industry, a purchaser is obligated to purchase only those

        quantities set forth in releases.  (Millington Trial Test.)

26.    Flexitech began issuing firm releases on March 13, 2006 and continued to issue

        firm releases throughout 2006.  (Trial Exs. 314, 315.)  Flexitech sent Sundram

        releases with firm delivery dates and quantities between 9 and 11 weeks in

        advance of the delivery date.  (Sekaran Dep. Test. at 110.)

27.    For Part 03, zero quantity firm releases were issued for February 26, 2007 and

        March 26, 2007.  (Trial Ex. 314.)

28.    For Part 04, zero quantity firm releases were issued for January 29, 2007,

        February 26, 2007, and March 26, 2007.

29.    Flexitech, on May 17, 2007, issued a final firm release for 100,000 Part 04 bolts

        after the blanket purchase order had been terminated. (Trial Ex. 315.)

9

30.    In addition to firm releases, Flexitech also provided forecasts.  For planning
       purposes, Sundram requested three months firm releases and three months
       planning releases, subject to a ten to fifteen percent variation.  (Trial Ex. 330;
       Vageeswaran Dep. Test. at 52.)

31.    A forecast is a non-binding estimate only.  Under standard industry practice, a
       purchaser is obligated to purchase only the quantities contained in firm releases.
       Forecasts are estimates or projections that are based upon information provided
       by the original equipment manufacturer, and projections do not create an
       obligation to purchase.  (DeMars Dep. Test. at 71-72; Kindred Dep. Test. at 93,
       Millington Trial Test.; Sekaran Dep. Test. at 96.)

32.    In June 2006, Flexitech sent Sundram a forecast of Flexitech's requirements for
       the banjo bolt purchases for the remainder of 2006 and all of 2007.  (Trial Ex.
       112.)  On September 19, 2006, Kathryn Kindred, Materials Manager at Flexitech,
       sent Sundram an email attaching a forecast for the balance of 2006 and 2007.
       (Trial Ex. 113; Kindred Dep. Test. at 10.)  This email stated: "This is forecast only
       and will be followed by firm releases which you should ship to."  (Trial Ex. 113.)
       Sekaran agreed that Kindred's statement was "common industry practice."
       (Sekaran Dep. Test. at 96.)

**E. The Supply Chain**

33.    The raw material that was used by Sundram for the fabrication of the banjo bolts
       was coiled steel rod.  (Joint Fact #36.)

34. Coiled steel rod was used for other products and customers as well, and was standard stock at Sundram. (Joint Fact #36(a).)

35. The first step in the manufacturing process was wire processing. This step was followed by forging. After the forging process, the bolts were sent to a subcontractor for drilling. After drilling, the bolts were sent to be heat treated, which was done at Sundram's facilities. After heat treating, the bolts were then sent to another subcontractor for grinding. On completion of grinding, the bolts were returned to Sundram to be inspected and packaged for shipment from India to the United States. (Joint Facts ## 37-42.)

36. Sundram shipped the bolts to the United States in single or multiple lots of 28,800 units per lot. (Joint Fact #43.)

37. The lots were sent to the PMI Warehouse in Michigan. (Turner Trial Test.) On behalf of Sundram, PMI shipped the bolts to Ajax Metal Processing in Warren, MI, to perform plating and coating of the bolts. (Joint Fact #44.) After coating, the bolts were sent back to PMI for final inspection and packaging for shipment to Flexitech. (Joint Fact #45.)

38. Once inspection and packaging are completed, PMI would inform Flexitech that approved quantities of bolts were available for pickup by Flexitech at PMI's facility. Pickup timing and the cost of transportation following pickup were the responsibility of Flexitech. (Joint Fact #46.)

39. The average manufacturing time in India for the banjo bolts was between four and eight weeks. The average time in transit for shipment between Sundram in India and PMI in Michigan when ocean transport was used was between six and

11

eight weeks.  The average processing time for one lot of bolts between arrival at PMI and completion of packaging at PMI following final inspection was approximately two weeks.  (Joint Facts ## 47-49.)

**F. Delphi**

40.   For part of 2004, 2005, and all of 2006, Sundram was the supplier of dimensionally identical banjo bolts to Delphi Corporation pursuant to a requirements contract.  (Joint Fact #8.)

41.   As of August 2006, Sundram was required to manufacture and ship 150,000 banjo bolts per week for Delphi.  On August 25, 2006, Delphi sent an e-mail to Sundram stating: "We are in danger of shutting down our customers and need to make sure you understand that Delphi must receive 150K parts each week until the end of December."  By email to Delphi dated August 28, 2006, Sundram stated that, based on Delphi's weekly requirements, Sundram must "increase the shipment from here."  On October 4, 2006, Delphi sent an email to Sundram requesting that Sundram continue to supply one of the banjo bolts to Delphi through the end of March 2007.  The quantity requested was 100,000 parts per week.  (Joint Fact #34(c),(d),(e),(g).)

42.   Sundram shipped Flexitech's and Delphi's banjo bolts to the PMI Warehouse.  (Turner Trial Test.)

43.   PMI considered the Sundram banjo bolts to be fungible and interchangeable between Delphi and Flexitech.  (Joint Fact #46(f),(g).)  It decided on the spot to ship bolts to either Flexitech or Delphi depending on which customer was "making the most noise" at the time.  (Turner Trial Test.)

12

44.     On various occasions, PMI shipped banjo bolts to Delphi that had been previously inventoried and designated for delivery to Flexitech and shipped to Flexitech bolts that had been previously inventoried and designated for delivery to Delphi.  (Joint Fact #46(h),(i).)

45.     In November 2006, Delphi notified Sundram that Delphi would cease purchasing banjo bolts from Sundram, effective December 18, 2006.  Following the termination of the supply of banjo bolts to Delphi in December 2006, all banjo bolts held or delivered to the PMI warehouse were inventoried as "Flexitech" bolts.  (Joint Fact #46(e),(j).)

### G. Termination

46.     As of September 2006, Flexitech management had decided that it would terminate Sundram as the supplier of banjo bolts as soon as an alternate supplier it had identified, MNP, could be qualified under applicable technical requirements (PPAP approval). (Trial Ex. 367.)

47.     It was Flexitech's policy, and industry practice, to not terminate an existing supplier until the new supplier received PPAP approval.  (Test. of Celso Pierre.)

48.     On January11, 2007, Kindred stated in an internal email that Sundram was planning to visit the plant and asked, "Should we tell them at this time that they are no longer the source?"  Flexitech did not tell Sundram that they were no longer the source at this point.  (Trial Ex. 371.)

49.     On January 29, 2007, Kindred stated in an internal email, "MNP's PPAP has been approved and they have releases to take over the production in February.  I have not given Sundram any releases beyond February though they are asking

13

for them daily."  DeMars responded, "February on - MNP to supply production."

(Trial Ex. 373.)

50.   Sundram sent emails to Flexitech on February 5, 2007, February 21, 2007,

February 26, 2007, March 9, 2007, and March 12, 2007, expressing concern

because it had not received any schedule reports showing delivery schedules for

February and March, 2007.  Flexitech did not send responses to these emails.

(Trial Ex. 354.)

51.   On March 22, 2007, Sundram sent an email to Kindred's successor, Mary Kay

Randall, inquiring as to the status of current schedules.  On March 23, 2007,

Randall replied and stated, "You are correct, you do not have any more releases

on your purchase order 3612331.  Please discontinue sending or making more of

the following part numbers: 36-75003 and 36-75004."  (Trial Ex. 358.)

52.   On March 29, 2007, Flexitech exercised its right to terminate the Blanket

Purchase Order pursuant to the Blanket Purchase Order's termination clause:

"Flexitech may terminate the Blanket Purchase Order in whole or in part at any

time, for any reason, without penalty."  (Trial Exs. 325, 326, 360.)

53.   Sundram was given written notice of the termination by letter dated March 29,

2007, which stated: "Flexitech will no longer require this part from Sundram. . . .

Please be aware that Flexitech has no contractual obligation to Sundram at this

time as your Purchase Order is based on firm releases from Flexitech."  (Trial Ex.

360.)

54.   Upon the termination of the Flexitech relationship with Sundram, Sundram

sought the recovery of the price or raw material and lost profits for all finished

14

and unfinished banjo bolts in its facility in India and at the PMI warehouse.  (Joint Fact #96(I).)

55.    About six weeks later, on May 17, 2007, Flexitech issued a firm release for 100,000 Part 04 bolts.  (Trial Ex. 315.)

56.    Flexitech paid for all quantities shipped by Sundram pursuant to issued releases. The quantities of finished and unfinished product held by Sundram are not the subject of releases issued by Flexitech.  (Joint Fact #96(e).)

### III. CONCLUSIONS OF LAW AND APPLICATION OF FACTS TO THE LAW

1.    In the automotive industry and under Michigan law,

> A blanket purchase order does not oblige [the seller] to manufacture or ship any parts.  That obligation arises when [the buyer] issues what is known as a shipment, production, or release order that would issue against the blanket purchase order.  Blanket purchase orders can last for some time, while shipment orders are issued against them.

*Detroit Radiant Prods. Co. v. BSH Home Appliances Corp.*, 473 F.3d 623, 631 (6th Cir. 2007) (quoting *Urban Assocs., Inc. v. Standex Electronics, Inc.*, No. 04-40059, 2006 WL 250020, at *1 (E.D. Mich. Jan. 30, 2006)); *see Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 487-88 (E.D. Mich. 1993).

2.    Under standard industry practice, a purchaser under a blanket purchase order is obligated to purchase only those quantities contained in firm releases.  A forecast is a non-binding estimate only.  It does not constitute a firm commitment to purchase a specific quantity of product.  *See Advanced Plastics Corp.*, 828 F. Supp. at 487.

15

3.    Blanket purchase orders that are "terminable at will" and "have no set quantity or duration are commonplace in the automotive industry in Michigan." *In re Dana Corp.*, No. 06-10354, 2007 WL 4105714, at *3 (Bankr. S.D.N.Y. Nov. 14, 2007) (applying Michigan law).

4.    A requirements contract is an agreement that provides "that the buyer will buy all of its needs or requirements from the seller." *Advanced Plastics Corp.*, 828 F. Supp. at 488 n.1 (citing *In re Atlas Concrete Pipe Inc.*, 668 F.2d 905, 910 (6th Cir. 1982)).

5.    Blanket Purchase Order No. P3612327 was the governing contractual document between Sundram and Flexitech.

6.    The Blanket Purchase Order was an offer, which Sundram accepted with full knowledge of its applicable terms and without proposing any modification to those written terms.

7.    The Blanket Purchase Order was not a requirements contract.

8.    The Blanket Purchase Order did not commit Flexitech to purchase, or Sundram to sell, any specific quantity of banjo bolts.

9.    The obligation to manufacture or ship parts arose only after Sundram received a release from Flexitech.

10.    Sundram never sought to amend or modify the Blanket Purchase Order in order to impose a minimum quantity requirement.

11.    Flexitech did not breach any contractual obligation to purchase the banjo bolts because it paid for all of the bolts for which it issued firm releases.  The

16

obligations Flexitech is alleged to have breached are not contained in the parties' contract.

12. Flexitech terminated the parties' contractual relationship by written notice and in accordance with the terms of the Blanket Purchase Order.

13. Michigan law, applicable here, has adopted the Uniform Commercial Code ("UCC") for contracts involving the sales of goods.  Mich. Comp. Laws § 440.2102.

14. Michigan's adoption of the UCC dictates that: "Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable."  Mich. Comp. Laws § 440.2309.

15. Words in a contract "should be given their ordinary and common sense meaning."  *Robich v. Patent Button Co. of Tenn., Inc.*, 417 F.2d 890, 892 (6th Cir. 1969).  "Courts can neither make a new agreement for the parties nor, by addition, give it a meaning contrary to its express and unambiguous terms." *Stein, Hinkle, Dawe & Assocs., Inc. v. Continental Casualty Co.*, 313 N.W.2d 299, 303 (Mich. Ct. App. 1981).

16. The Blanket Purchase Order dispensed with a notice requirement because it stated that it could be terminated "at any time, for any reason, without penalty."

17. The nature of the contract as a blanket purchase order also indicates that the parties dispensed with a notice requirement.  Under Michigan law, no obligation

arises under a blanket purchase order until the purchaser issues a release.  *See Detroit Radiant Prods. Co.*, 473 F.3d at 631.

18.     Flexitech could have perpetually issued firm releases of "zero quantity" without technically "terminating" the Blanket Purchase Order and Sundram would have had no basis for complaint.  It defies common sense to import a requirement for advance notice of termination into a contract where it would be possible for the contract to exist in perpetuity without any obligations arising under it.

19.     Sundram's argument under Mich. Comp. Laws § 440.2309(3) fails because the parties dispensed with advance notification and because Sundram has not demonstrated procedural or substantive unconscionability.

20.     Even if Mich. Comp. Laws § 440.2309(3) required "reasonable notification" in this case, Flexitech's notice of termination was reasonable under the circumstances and did not produce an unconscionable result.

21.     "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."  Mich. Comp. Laws § 440.1204.

22.     Notice consistent with the terms of the contract is reasonable.  *Advanced Plastics Corp.*, 828 F. Supp. at 487.

23.     Flexitech's notice was reasonable because it was in accord with the terms of the Blanket Purchase Order.  Sundram was on notice that the blanket purchase order could be terminated "at any time, for any reason, without penalty."

24.     Based on the nature of the Blanket Purchase Order in this case, the notice given was reasonable because there were no firm releases outstanding.  *Id.*

18

25.   Numerous witnesses testified about the industry standard that a purchaser under
      a blanket purchase order is liable only for those quantities subject to firm
      releases.  A notice of termination of a contract at a time when neither party has
      any outstanding obligations under it is not unreasonable.

26.   Sundram, having received three consecutive months of zero quantity firm
      releases before the contract was terminated, was on notice that the relationship
      may be troubled and may not continue.  This further supports the conclusion that
      the notice given was reasonable.

27.   Sundram is not entitled to the damages it seeks as recovery of the total purchase
      price of quantities of banjo bolts that were never the subject of firm releases from
      Flexitech.

28.   Sundram is not entitled to any damages based on inadequate notice both
      because the blanket purchase order dispensed with notice and because notice
      contemporaneous to termination was reasonable under the circumstances.

**IV. CONCLUSION**

When a purchaser obtains a new supplier, an ideal situation describing
hypothetical "best practices" would be for the purchaser to wind down the existing
supply chain.  In addition, when parties are in a contractual relationship, each no doubt
expects the other to be reasonably forthright and to respond to requests for
communication.  Flexitech appears to have done neither in this case.  However,
"[c]ontract law does not require parties to behave altruistically toward each other; it does
not proceed on the philosophy that I am my brother's keeper."  *The Original Great Am.*
*Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir.

1992).  Nor is a "punctilio of an honor the most sensitive" the governing standard.

*Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.).  Instead, the

purchaser is bound to abide by the contract that it entered into, here a blanket purchase

order.  Under a blanket purchase order, the purchaser is responsible for purchasing

only quantities that are the subject of firm releases.  Forecasts are nothing more than

forecasts, and do not create a legal obligation to purchase.  Flexitech performed its

contractual duties by paying for all of the bolts for which it issued firm releases.  Thus, it

is not liable for any additional bolts that Sundram claims were left in the supply chain.

Sundram could have protected itself by entering into a requirements contract or

otherwise binding Flexitech to purchase the 4.5 million bolts on which Sundram based

its price.  Sundram could also have protected itself by adding language to the contract

regarding the disposition of inventory and works in progress upon termination.  Instead,

it chose not to address this subject because when "we received the order and we

started our business relationship, the first thing we don't want to go and tell [sic] about

the termination of the business."  (Vageeswaran Dep. Test. at 48.)  This is a fair enough

reaction from a business standpoint.  But from a legal standpoint, this manner of

proceeding carries with it certain risks.  Given Sundram's situation as a supplier located

on the other side of the world and the concomitantly lengthy supply chain, it would have

done well to better protect itself when entering into the contract.

As the Eastern District of Michigan has stated, "Sympathy for plaintiff's position

does not change the result.  Plaintiff's difficulty is a result of the type of contract it

negotiated and to which it agreed.  It seems clear that plaintiff, in order to obtain

20

defendant's business, agreed to terms that favored defendant." *Advanced Plastics Corp.*, 828 F. Supp. at 488.

The court observes that Sundram seems to have acted consistent with an expectation that the Flexitech relationship would carry the same kind of contract benefits and burdens it was experiencing with Delphi, but the Delphi relationship was different: it was a requirements contract with significantly different termination implications.  Sundram pressed on nonetheless, and now asks the court to, in essence, convert the Blanket Purchase Order relationship at issue here into something that more closely resembles a requirements contract.  Plaintiff, however, is bound by the contract terms and cannot now complain because it turned out that those terms provided inadequate protection for it upon the contract's termination.

For the reasons discussed above, the court finds in favor of Defendant and against Plaintiff.  A separate judgment will issue.

s/Robert H. Cleland_____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  November 9, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 9, 2009, by electronic and/or ordinary mail.

s/Lisa Wagner_____
Case Manager and Deputy Clerk
(313) 234-5522